UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MARY VONDERAU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:15-cv-243 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Mary Vonderau, on August 31, 2015.[1] For the following reasons, the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, Mary Vonderau, filed an application for Disability Insurance Benefits and Supplemental Security Income on July 26, 2012, alleging a disability onset date of June 9, 2011. (Tr. 8). The Disability Determination Bureau denied Vonderau's application on December 4, 2012, and again upon reconsideration on January 8, 2013. (Tr. 8). Vonderau subsequently filed a timely request for a hearing on February 20, 2013. (Tr. 8). A hearing was held on December 13, 2013, before Administrative Law Judge (ALJ) Patricia Melvin, and the ALJ issued an unfavorable decision on April 25, 2014. (Tr. 8–16). Vocational Expert (VE) Marie N. Kieffer, Vonderau, and Vonderau's husband, Casey Vonderau, testified at the hearing. (Tr. 8). The

---

[1] On November 19, 2015, this case was reassigned to Magistrate Judge Susan L. Collins upon the parties' consent under 28 U.S.C. § 636(c), and then was reassigned to Magistrate Judge Andrew P. Rodovich. On August 5, 2016, the court ordered the parties to file any objection to Magistrate Judge Rodovich conducting all further proceedings in this case. Because neither party filed an objection, this court finds that the parties voluntarily consent to Magistrate Judge Rodovich under 28 U.S.C. § 636(c).

Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3).

The ALJ found that Vonderau met the insured status requirements of the Social Security Act through June 30, 2012. (Tr. 10). At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Vonderau had not engaged in substantial gainful activity since June 9, 2011, the alleged onset date. (Tr. 10). At step two, the ALJ determined that Vonderau had the following severe impairments: osteoarthritis and fibromyalgia. (Tr. 10). At step three, the ALJ concluded that Vonderau did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 10). Specifically, she found that Vonderau did not meet Listing 1.02, major joint dysfunction. (Tr. 11).

The ALJ then assessed Vonderau's residual functional capacity (RFC) as follows:

> the claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). She can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently. She [can] stand and/or walk for 6 hours in an 8-hour day; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She must also avoid concentrated exposure to wetness and slick/uneven surfaces; and avoid even moderate exposure to work at unprotected heights.

(Tr. 11). The ALJ explained that in considering Vonderau's symptoms she followed a two-step process. (Tr. 11). First, she determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce Vonderau's pain or other symptoms. (Tr. 11). Then, she evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Vonderau's functioning. (Tr. 11).

2

Vonderau alleged that she needed two knee replacements, that her knees were bone on bone, that she had swelling in her legs and feet, that she had no cartilage remaining in her hip, and that she had arthritis. (Tr. 11). One month after having a scope on each knee, Vonderau saw Dr. Gregory M. Sassmannshausen, an orthopedic surgeon, for pain and swelling, particularly in her left knee. (Tr. 11). At that time, Vonderau was working and climbing stairs, squatting, and kneeling. (Tr. 11). Dr. Sassmannshausen's examination showed no appreciable effusion bilaterally, Vonderau could maintain her motion well bilaterally, and she had diffuse medial joint line tenderness bilaterally. (Tr. 11). Dr. Sassmannshausen put Vonderau on a sixteen day Prednisone taper and restricted her from squatting, kneeling, or climbing stairs at work. (Tr. 11).

On September 4, 2012, Vonderau went to Dr. Berend for bilateral knee pain mostly in her left knee. (Tr. 12). Vonderau indicated that non-steroidal anti-inflammatory drugs and Hydrocodone did not relieve her pain, that her pain worsened with activity, and that her joints were stiff in the morning but improved with activity. (Tr. 12). The physical examination showed mild synovitis in both knees and a full range of motion. (Tr. 12). Additionally, x-rays showed joint space preservation. (Tr. 12). Dr. Berend concluded that she had multiple joint arthralgias, referred her to a rheumatologist, and did not think that surgery was necessary. (Tr. 12).

On October 29, 2012, Dr. Abdali S. Jan saw Vonderau for a disability physical examination. (Tr. 12). Vonderau reported joint pain, difficulty walking, decreased energy, and trouble sleeping. (Tr. 12). She rated her pain as seven out of ten in her knees and hands. (Tr. 12). Vonderau could dress herself, prepare meals, and drive but needed assistance with shirts, tying shoes, and buttons. (Tr. 12). She stated that she could sit for ten minutes, walk a quarter of

3

a city block, and stand for five to ten minutes. (Tr. 12). Vonderau generally stood against something to support herself and wore knee and hand braces. (Tr. 12).

Vonderau reported joint pain, stiffness, and swelling and muscle pain and weakness. (Tr. 12). During the exam, Dr. Jan concluded that Vonderau had a normal posture, limped, was not in acute distress, had muscle weakness in her arms and legs, and had a weak grip strength. (Tr. 12). Vonderau had muscle pain, abnormal joint movement, abnormal heel and toe walking, and range of motion deficits. (Tr. 12). However, she had no tenderness to palpation and a normal tandem walk. (Tr. 12). Dr. Jan concluded that Vonderau had arthritis in her knee, that she could step up sixteen inches without disability, and that she had normal fine motor skills with normal handling of fine objects. (Tr. 12). However, Dr. Jan indicated that Vonderau had difficulty with fine motor skills at times and that she avoided handling fine objects or lifting heavy objects. (Tr. 12). She also found that Vonderau had normal concentration and interaction, had an intact remote and recent memory, and had normal hearing, speech, and vision. (Tr. 12). Dr. Jan concluded that Vonderau had bilateral knee compartmental osteoarthritis, had bilateral knee pain, and had difficulty standing or walking long distances. (Tr. 12).

Dr. A. Smith, a rheumatologist, conducted a consultative examination on January 17, 2013 for Vonderau's knee pain. (Tr. 13). Vonderau stated that she felt a popping sensation in her left knee, along with severe pain, while kneeling on her hands and knees. (Tr. 13). A surgeon diagnosed an overgrowth on her knees and performed arthroscopic surgery on each knee. (Tr. 13). However, the surgery did not improve her knees as she continued feeling a constant dull and a burning discomfort. (Tr. 13). Vonderau did not receive injections or physical therapy. (Tr. 13).

In 2012, Vonderau had arthroscopic surgery on each knee for a second time, but her discomfort worsened after the surgeries. (Tr. 13). However, she wore a brace after the surgeries, and her symptoms resolved after two months. (Tr. 13). Vonderau could complete her household chores, but she experienced aches and pains and her symptoms worsened after a half hour of walking. (Tr. 13). During Dr. Smith's evaluation, Vonderau was not in distress, had normal grip and general strength, had mild hypermobility, and had a normal gait. (Tr. 13). Dr. Smith found that she had fibromyalgia, which was aggravated by emotional stress. (Tr. 13). He indicated that her fibromyalgia and hypermobility could have caused her knee aches. (Tr. 13). He instructed Vonderau to perform stretching and relaxation exercises throughout the day and encouraged her to perform a half hour of low impact aerobic exercise at least three times a week. (Tr. 13).

Dr. Jeffrey Harris saw Vonderau for knee pain on August 20, 2013. (Tr. 13). At the exam, Vonderau had full extension in each knee, had mild pain to palpation, and her ligaments were stable. (Tr. 13). X-rays showed some mild narrowing of her medical compartment bilaterally. (Tr. 13). Dr. Harris concluded that she had bilateral degenerative osteoarthritis in her knee and bilateral knee pain. (Tr. 13). He did not think that surgery was necessary, but he recommended that she wear lateral heel wedges, undergo physical therapy, and receive an anti-inflammatory. (Tr. 13).

The ALJ found that Vonderau's impairments could have caused her alleged symptoms, but that Vonderau was incredible regarding the intensity, persistence, and limiting effects of her symptoms. (Tr. 14). She stated that Vonderau's knee pain was not as bad as she alleged. (Tr. 14). The ALJ noted that Vonderau's presentation at her consultative examination was much worse than her presentation at her rheumatology consultation. (Tr. 14). For example, at the consultative examination she limped, had muscle weakness, diminished grip strength, range of

motion deficits, muscle pain, abnormal joint movement, and could not heel toe walk. (Tr. 14). However, at the rheumatology consultation, she had a normal gait, had no synovitis, dactylitis, or enthesitis, her general and grip strength were normal, she had mild hypermobility, she had a slight bilateral osteoarthritic enlargement, and she had a straight, non-tender spine with a full range of painless movement. (Tr. 14).

The ALJ gave great weight to the Disability Determination Services' opinion that Vonderau could perform sedentary work with occasional postural limitations. (Tr. 14). She indicated that the opinion was consistent with the internal medicine consultative examination and the rheumatology consultation, which she relied on to support her RFC. (Tr. 14). The ALJ also gave great weight to Dr. Jan's opinion. (Tr. 14).

At step four, the ALJ found that Vonderau could not perform her past relevant work. (Tr. 14–15). Considering Vonderau's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that she could perform, including addresser (275 jobs in Indiana and 38,000 jobs nationally), charge account clerk (2,400 jobs in Indiana and 126,000 jobs nationally), and document preparer (31,000 jobs in Indiana and 1.4 million jobs nationally). (Tr. 15–16).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Moore v. Colvin***, 743 F.3d 1118, 1120–21 (7th Cir. 2014); ***Bates v. Colvin***, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the

correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520, 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b), 416.920(b)**. If she is, the claimant is not disabled and the evaluation process is

7

over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e)**. However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

Vonderau has argued that the ALJ's credibility finding was patently wrong. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. ***Bates v. Colvin***, 736 F.3d 1093, 1098 (7th Cir. 2013); ***Schmidt v. Astrue***, 496 F.3d 833, 843 (7th Cir. 2007); ***Prochaska v. Barnhart***, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. ***Nelson v. Apfel***, 131 F.3d 1228, 1237

(7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Bates*, 736 F.3d at 1098.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. § 404.1529(a);** *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. § 404.1529(c);** *see Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

9

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not disregard an individual's statements about symptoms solely based on objective medical evidence. SSR 16-3p, at *5[2]; *see* **Moore v. Colvin**, 743 F.3d 1118, 1125 (7th Cir. 2014) ("'[T]he ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence.'") (quoting **Indoranto**, 374 F.3d at 474); **Carradine v. Barnhart**, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

**Luna v. Shalala**, 22 F.3d 687, 691 (7th Cir. 1994); *see* **Zurawski v. Halter**, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, she must make more than "a single, conclusory

---

[2] The Social Security Administration updated its guidance about evaluating a claimant's symptoms. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). SSR 16-3p superseded SSR 96-7p and removed the term "credibility" from the Administration's policies. SSR 16-3p at *1. The new policy clarifies that an ALJ should not examine a claimant's character similar to an adversarial proceeding when evaluating the claimant's subjective symptoms. SSR 16-3p at *1. Although SSR 16-3p post-dates the ALJ hearing in this case, a regulation that clarifies rather than changes existing law is appropriate on appeal. **Pope v. Shalala**, 998 F.2d 473, 482–83 (7th Cir. 1993), *overruled on other grounds by* **Johnson v. Apfel**, 189 F.3d 561 (7th Cir. 1999). Because SSR 16-3p clarifies the Administration's policies, this court will evaluate the ALJ's findings under the Administration's new guidance. *See* **Roper v. Colvin**, 2016 WL 3940035, at *3 (N.D. Ill. July 21, 2016) (finding it appropriate to consider the new regulation on appeal).

10

statement . . . . The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *9; *see* **Minnick v. Colvin**, 775 F.3d 929, 937 (7th Cir. 2015) ("[A] failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal.") (citations omitted); **Zurawski**, 245 F.3d at 887; **Diaz v. Chater**, 55 F.3d 300, 307–08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). She must "build an accurate and logical bridge from the evidence to her conclusion." **Zurawski**, 245 F.3d at 887 (quoting **Clifford v. Apfel**, 227 F.3d 863, 872 (7th Cir. 2000)). A minor discrepancy, coupled with the ALJ's observations is sufficient to support a finding that the claimant was incredible. **Bates**, 736 F.3d at 1098. However, this must be weighed against the ALJ's duty to build the record and not to ignore a line of evidence that suggests a disability. **Bates**, 736 F.3d at 1099.

The ALJ found that Vonderau was not credible regarding the intensity, persistence, and limiting effects of her symptoms. (Tr. 14). Specifically, she found that Vonderau's knee condition was poor but that it was not as poor as she alleged. (Tr. 14). In support of that finding, the ALJ indicated that Vonderau presented much worse at her consultative examination than at her rheumatology consultation. (Tr. 14). She noted that Vonderau demonstrated worse physical symptoms at her consultative examination and that her rheumatology consultation had some normal findings. (Tr. 14).

Vonderau has argued that the ALJ failed to explain why the inconsistent presentations made her incredible. She has indicated that the ALJ did not explain whether she considered the inconsistent presentations to be symptom magnification or whether she believed that Vonderau's

11

condition had improved.  Vonderau also has claimed that the ALJ ignored evidence that explained the differences between her presentations and would eliminate any inference that she faked her symptoms.  For example, she noted that she had more time to improve after her surgery at the rheumatology consultation and that her symptoms varied.  Additionally, Vonderau has claimed that the ALJ "played doctor" by relying on her lay interpretation of the objective medical evidence rather than relying on a medical expert to explain the differences.  She has indicated that the ALJ failed to recognize that her joint hypermobility could cause pain and stiffness, that her rheumatologist found her complaints credible, and that the ALJ ignored how her fibromyalgia affected her symptoms.

Vonderau acknowledged that the non-examining opinion evidence could support the credibility finding, but she indicated that the doctors reviewed the file before her rheumatology consult or her fibromyalgia diagnosis.  Therefore, she has argued that their assessments were based on an incomplete record and that they could not provide the necessary logical bridge.  She has claimed that the objective medical evidence supported her claims, especially in light of her fibromyalgia.  In particular, Vonderau has pointed out that Dr. Smith was aware of her complete medical history before he conduct the rheumatology exam and that he still found the improvements.  Moreover, she has claimed that the ALJ failed to account for her inability to sit longer than fifteen minutes without getting up.

The Commissioner has indicated that the ALJ did not reject Vonderau's complaints but that she partially credited her complaints.  She has argued that the ALJ supported her credibility finding with sufficient reasoning.  She has claimed that the ALJ listed inconsistencies in Vonderau's physical examinations, noted Vonderau's statement that her stiffness improved with activity, noted that multiple doctors recommended conservative treatment, and considered the

12

medical opinions. The Commissioner also has argued that the ALJ did not play doctor when she evaluated the medical evidence. She has noted that the ALJ made a reasonable inference after comparing Vonderau's abnormal 2012 examination with her mostly normal 2013 examination.

The Commissioner has indicated that the ALJ did not need to consult a medical expert because the record was adequately developed and the ALJ understood Vonderau's claims. Despite Vonderau's claims otherwise, the Commissioner noted that the ALJ did not reject her claims of joint pain and stiffness or hypermobility because the ALJ acknowledged those findings and indicated that they could have caused Vonderau's knee discomfort. The Commissioner also has indicated that the ALJ's findings were not contrary to Dr. Smith's findings. She has stated that the ALJ did not discredit Dr. Smith's findings, that the ALJ did not find that Vonderau exaggerated her symptoms, and that the ALJ understood and acknowledged her fibromyalgia. Furthermore, the Commissioner has argued that the ALJ did not evaluate Dr. Ruiz's opinion improperly. She has indicated that state agency physicians generally do not review the entire record and that Dr. Smith's opinion did not contradict Dr. Ruiz's opinion.

Although the Commissioner has offered a number of reasons to support the ALJ's credibility finding, the record does not support those reasons. First, the Commissioner has indicated that the ALJ relied on Vonderau's statement that her morning joint stiffness improved with activity. The ALJ did not cite that statement as supporting her credibility finding nor did she explain why it made Vonderau incredible. The ALJ did not explain how Vonderau's statement contradicted her allegation that she could not sit for prolonged periods without needing to get up to improve her knee stiffness. Therefore, the ALJ has not created a logical bridge from Vonderau's statement to her finding.

13

Second, the Commissioner has argued that the ALJ noted that doctors recommended conservative treatment. Again, the ALJ did not cite this evidence as supporting her credibility finding or explain how it would support her finding. Although some doctors recommended conservative treatment, Vonderau also had surgery on each knee twice. Without any explanation showing what treatment Vonderau declined or avoided, it is unclear how conservative treatment between surgeries rendered Vonderau incredible.

Third, the Commissioner has argued that the ALJ relied on the objective medical evidence. The ALJ specifically noted the different objective findings between Vonderau's 2012 consultative examination and her 2013 rheumatology consult. The ALJ indicated that Vonderau's presentation was significantly worse in 2012 than in 2013. However, the ALJ cannot solely rely on the objective medical evidence to discount Vonderau's complaints of pain. SSR 16-3p, at *5. Additionally, it is unclear why Vonderau's 2013 consult rendered her claims incredible when the doctor diagnosed her with fibromyalgia and stated that her fibromyalgia and joint hypermobility likely contributed to her ongoing pain. (Tr. 328–32). The ALJ should have explained why Dr. Smith's rheumatology consult contradicted Vonderau's allegations when his conclusion identified a source for her ongoing pain.

Finally, the Commissioner has claimed that the ALJ relied on the medical opinion evidence to discount Vonderau's claims. She has indicated that the ALJ mentioned the opinions of Drs. Jan and Ruiz. However, the ALJ did not cite either opinion in support of her credibility finding. Dr. Jan concluded that Vonderau had bilateral knee pain and had trouble standing and walking long distances. (Tr. 307). During his examination, Dr. Jan found that Vonderau had muscle weakness, a limp, abnormal joint movement, and range of motion deficits. (Tr. 12). Moreover, the ALJ noted that Dr. Jan's examination showed abnormal objective signs. (Tr. 14).

14

The ALJ did not explain how Dr. Jan's opinion or examination rendered Vonderau incredible. Dr. Ruiz reviewed the objective medical evidence before Dr. Smith diagnosed Vonderau with fibromyalgia and indicated that it contributed to her pain. The ALJ did not ask Dr. Ruiz or another non-examining physician to review the record after that diagnosis. Therefore, it is unclear how Dr. Ruiz's opinion would change with an updated record and whether that would have changed the credibility finding.

The ALJ did not provide a logical bridge from the evidence to her credibility finding. She did not explain how Vonderau's statement or the recommended conservative treatment rendered Vonderau incredible. Therefore, the only remaining reason to support the credibility finding was the differing objective medical evidence. However, the ALJ did not explain or provide substantial evidence for discounting the 2013 consult over the 2012 consultation when Dr. Smith identified a source of Vonderau's pain. The ALJ's credibility finding was not supported with substantial evidence and was patently wrong. The ALJ should further explain her credibility finding on remand.

Based on the foregoing reasons, the opinion of the ALJ is **REMANDED** for further proceedings consistent with this order.

ENTERED this 23rd day of August, 2016.

/s/ Andrew P. Rodovich
United States Magistrate Judge